**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JONATHAN D. STEWARD | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI, | : | |
| Commissioner of Social Security | : | NO. 22-0322 |

**REPORT AND RECOMMENDATION**

SCOTT W. REID                                              DATE:  January 11, 2023
UNITED STATES MAGISTRATE JUDGE

      Jonathan Steward brought this action under 42 U.S.C. §405(g) to obtain review of the decision of the Commissioner of Social Security denying his claim for Disability Insurance Benefits ("DIB").  He has filed a Request for Review to which the Commissioner has responded. For the reasons set forth below, I recommend that Steward's Request for Review be denied, and judgment entered in favor of the Commissioner.

**I.      *Factual and Procedural Background***

      Steward was born on August 28, 1984.  Doc. 8-6, 21.  He completed high school and worked as a bread machine operator, machine operator, forklift operator, and packer. Doc. 8-6, 4; Doc. 8-3, 14. On August 26, 2020, Steward filed an application for DIB.  He alleged that he was unable to work since April 18, 2018 due to Crohn's colitis (with abscess), pyoderma gangrenosum, and anemia.  Doc. 8-6, 3.  This application was denied by the state agency both initially and upon reconsideration.  Doc. 8-6, 23, 33.  Following these denials, Steward requested a hearing de novo in front of an administrative law judge (ALJ) on May 3, 2021.  Steward and a vocational expert (VE) both testified.  Tr. 30-61.

The ALJ determined that Steward was not disabled.  Although the ALJ found that Steward had severe impairments and non-severe impairments, she also found that Steward had the residual functional capacity (RFC) to perform sedentary work, with some limitations.  Tr. 16. Steward requested review of the ALJ's decision.  The Appeals Council found no error and denied review.  Doc. 8-2, 2.  As a result, Steward commenced the action before this court.

## II.    *Legal Standards*

The role of this court on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. §405(g); *Richardson v. Perales*, 402 U.S. 389 (1971); *Newhouse v. Heckler*, 753 F.2d 283, 285 (3d Cir. 1985).  Substantial evidence is relevant evidence which a reasonable mind might deem adequate to support a decision. *Richardson v. Perales*, *supra*, at 401.  A reviewing court must also ensure that the ALJ applied the proper legal standards.  *Coria v. Heckler*, 750 F.2d 245 (3d Cir. 1984); *Palmisano v. Saul*, Civ. A. No. 20-1628605, 2021 WL 162805 at *3 (E.D. Pa. Apr. 27, 2021).

To prove disability, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period."  42 U.S.C. §423(d)(1).  As explained in the following agency regulation, each case is evaluated by the Commissioner according to a five-step process:

> (i) At the first step, we consider your work activity, if any.  If you are engaging in substantial gainful activity, we will find that you are not disabled.  (ii)  At the second step, we consider the medical severity of your impairment(s).  If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in §404.1590, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.  (iii)  At the third step, we also consider the medical severity of your impairment(s).  If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

20 C.F.R. §404.1520(4) (references to other regulations omitted).

Before going from the third to the fourth step, the Commissioner will assess a claimant's residual functional capacity ("RFC") based on all the relevant medical and other evidence in the case record.  *Id*.  The RFC assessment reflects the physical and mental work activities an individual can still perform, despite any limitations.  SSR 96-8p.

The final two steps of the sequential evaluation then follow:

(iv)  At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work.  If you can still perform your past relevant work, we will find that you are not disabled.  (v)  At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work.  If you can make the adjustment to other work, we will find that you are not disabled.  If you cannot make an adjustment to other work, we will find that you are disabled.

*Id*.

### III.     *The ALJ's Decision and the Claimant's Request for Review*

In her decision, the ALJ determined that Steward suffered from the severe impairments of plaque arthritis, plaque psoriasis with a history of chronic skin ulcer, palmoplantar psoriasis, chronic ulcerative enterocolitis, Crohn's disease of the colon and large bowel, and inflammatory bowel disease.  Tr. 14-16.  She also found that he suffered from multiple non-severe impairments.  *Id*.  However, none of Steward's impairments medically equaled a listed impairment.  Tr. 15.  The ALJ found that Steward's condition "responded well to treatment," and although his impairments "could reasonably be expected to cause the alleged symptoms… the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record…".  Tr. 18-19.

As to Steward's RFC, the ALJ wrote:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except: He is limited to occupations that require no more than occasional postural maneuvers, such as balancing, stooping, kneeling, crouching, and climbing on ramps and stairs, but he must avoid occupations that require climbing on ladders, ropes, and scaffolds, or crawling. He must avoid occupations that require pushing or pulling with the lower extremities to include the operation of pedals. He must avoid occupations that require pushing and pulling with the upper extremities to include the operation of hand levers. He must avoid concentrated prolonged exposure to temperature extremes, vibration, or extreme dampness and humidity. He is limited to occupations which do not require exposure to hazards such as dangerous machinery and unprotected heights.

Tr. 16.

Relying on the VE, the ALJ found that, although Steward could not return to his prior relevant work, he could work as a surveillance system monitor, final assembler, or inspector. Tr. 24. She decided, therefore, that he was not disabled. Tr. 25.

In Steward's Request for Review, he makes a number of claims under the umbrella of the argument that the ALJ "failed to properly consider and discuss her reasons for rejecting the evidence of his limitations related to his gastroenterological conditions." Pl. Br. 7. These claims can be sorted into five categories:

1. Steward argues that the ALJ improperly suggested that Humira adequately controlled his condition, and that his discontinuing Humira was the reason for his subsequent hospitalization. Pl. Br. 8. First, he claims that he did not intentionally discontinue Humira. *Id.* Second, he argues that Humira did not adequately control his symptoms, and the ALJ's opinion to the contrary is "pure speculation." *Id.*

2. Steward argues that the ALJ inappropriately considered his ability to perform certain activities at home, ignoring the fact that he would have immediate access to a bathroom at home. Pl. Br. 9.

3. Steward contends the ALJ "failed to consider and explain her reasons for discounting the pertinent evidence relating to the Plaintiff's gastroenterological condition as required." Pl. Br. 9. Somewhat more specifically, Steward argues that his treatment and hospital records were not considered as part of his residual functional capacity. *Id.*

4. Steward claims that the ALJ improperly failed to consider the VE's response to a hypothetical question regarding a person who "has to be off task more than 30% of the workday due to chronic and severe Crohn's disease where he has the uncontrolled need to go to the bathroom and the need to shower and clean himself through the day." Pl. Br. 9.

5. Steward contends that his medical record substantiates his self-reported symptoms, which the ALJ disregarded. Pl. Br. 10.

Each of Steward's arguments fail for the reasons outlined below.

## IV. *Discussion*

### A. *Steward's use of Humira*

At the center of Steward's argument is his responsiveness to Humira infusions. The ALJ determined that Steward's condition had been adequately controlled with Humira and that his symptoms after his date last insured (March 31, 2021) were caused by his discontinuance of Humira. Tr. 20. Steward disagrees for two reasons. First, he claims that his condition did not improve while he was on Humira, and refers to the effectiveness of Humira as "pure speculation." Pl. Br. 8. Second, he argues that his discontinuance of Humira was not deliberate, and was instead due to insurance issues. *Id*. Since the ALJ relied on substantial evidence that Steward's condition was sufficiently controlled by Humira, Steward's arguments fail.

i.      *Stewart's responsiveness to Humira infusions*

Steward's physician prescribed Humira in May of 2019.  Doc. 8-7, 7.  A prior authorization was approved in September of 2019.  Doc. 8-7, 30.  By November of 2019, within two months of starting Humira, Steward's perianal and dermatological symptoms partially responded to the treatment.  During a dermatology visit on November 13, 2019, Steward reported that his psoriasis improved ("Rash is clearing up, nails are improving.  Rash has cleared up, only noted primarily now on hands and feet.").  Doc. 8-7, 17.  During a gastroenterology appointment on November 20, Steward reported that despite only taking five doses of Humira, his condition already improved by 50%.  ("Overall about 50% improved since starting biologics.").  Doc. 8-7. 69.   He went from using the bathroom twelve times a day to three to four times a day and had no fistulas.  *Id.*

While Steward was using Humira, his gastroenterologist stressed the importance of frequent disease assessments in order to adjust and optimize his dose.  Steward's Humira drug level was tested in December of 2019 at "above [the] minimum therapeutic goal" but "slightly on the low side" for perianal disease, which has a higher target level.  Doc. 8-7, 69.  Steward's gastroenterologist advised him that, while "Humira is certainly an excellent drug for perianal disease…we know that we need higher levels…to adequately treat perianal disease and it can take months for fistulas to heal."  Doc. 8-7, 77.   He directed that Steward's Humira dose would need to be sustained at a higher dose for at least 6-12 months in order to adequately treat his disease.  Doc. 8-7, 77.  Steward's gastroenterologist advised him to be reevaluated both via endoscopy in March of 2020, and via blood test (for a Humira trough level) so that his Humira dose could be optimized on a weekly basis.  Doc. 8-7, 77.  He also suggested that an additional drug could be added on, depending on the results of Steward's successive blood tests.  *Id.*

However, Steward missed both a February follow-up appointment and the March colonoscopy. *Id*. He did not visit his gastroenterologist again until September of 2020. *Id*.

During the September 2020 visit, Steward's gastroenterologist noted his failure to follow up in February and March as directed. Doc. 8-7, 69. Steward reported that he was using the bathroom four to five times per day and experiencing drainage from two mature fistulas. His abdomen examination was normal. Doc. 8-7, 70. His gastroenterologist described that "he does not have much in the way of active colonic disease." *Id*. As above, Steward's gastroenterologist again advised an endoscopy to restage Steward's disease, so that they could "push" the Humira dose. Doc. 8-7, 72. He again explained the importance of optimizing his Humira levels or adding a second medication. *Id*. Steward's gastroenterologist advised Steward to schedule an appointment for the first available colonoscopy and sent him home with a colonoscopy preparation kit. Steward did not comply with his doctor's instructions. Doc. 8-8, 18. This was Steward's final gastroenterology appointment during his insured period.

Our Court of Appeals determined that ALJs should accord reports of treating physicians great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Plummer v. Apfel,* 186 F.3d 422, 429 (3d Cir. 1999). Improvement while on medication is a valid reason to discount subjective complaints. *See* 20 C.F.R. §§ 404.1529(c)(3)(iv), 416.929(c)(3)(iv) (ALJ must consider effectiveness of medication). The ALJ determined that Steward was not disabled almost entirely based on his treating physicians' opinions. She summarized his examinations and treatment plans which indicated improvement while on Humira and worsening while noncompliant. Tr. 21-22. Since the ALJ reasonably relied on Steward's treatment records and

the opinions of his treating physicians, Steward's argument that any improvement is "speculative" fails.

ii.     *Steward's Discontinuance of Humira*

Steward claims that, despite his persistent efforts, he was forced to stop taking Humira in September of 2020 due to insurance issues.  However, the record of his September 9, 2020 gastroenterology appointment does not mention this problem, and in fact contemplates increasing Steward's Humira dose.  *Id.*  During his next medical appointment on February 11, 2021, Steward informed his new primary care physician that he was new to the area and needed a referral to a local gastroenterologist.  Doc. 8-8, 50.[1]  He also indicated that he had ceased Humira in September of 2020 due to insurance issues and would need assistance from a gastroenterologist in resuming the medication.  *Id.*  Despite Steward's claims that he was "actively seeking a referral for a new gastroenterologist" and that he had "credible reasons" for discontinuing Humira, this was apparently the first time in five months that he mentioned his insurance and medication issues to any provider.  Pl. Br. 8.

Steward was then referred to a gastroenterologist who, on February 16, directed via phone call that Steward would need to seek treatment elsewhere, as their office did not prescribe Humira.  *Id.* at 52.  He was referred to a second gastroenterologist who, on February 22, again advised that Steward would need to seek treatment elsewhere, as their office did not accept his insurance.  *Id.* at 51.  On February 23, Steward's primary care physician then informed Steward that he would need to call his insurance company and find a gastroenterologist that *would* accept his insurance.  Steward indicated that he understood it was his responsibility to find a suitable gastroenterologist and to communicate this choice to his primary care physician for a referral.

---

[1] Steward moved from Allentown, PA to Leighton, PA.  Doc. 8-8, 53.

*Id.* at 52.  On March 4, Steward again called his primary care physician and asked that he call in a referral to a third gastroenterologist.  *Id.* at 51.  His primary care physician called in the referral to the physician Steward requested.[2]  *Id.*  On March 19, Steward called his primary care physician again, this time asking for the details of the referral that he placed.  *Id.*  Steward then made an appointment with this new gastroenterologist for June of 2021.  Doc. 8-8, 22.

Steward was last insured on March 31, 2021.  In April of 2021, Steward was hospitalized after experiencing two weeks of abdominal pain.  Doc. 8-8, 11.  He reported to hospital medical providers that Humira provided adequate control of his symptoms, and that his cessation of Humira in September due to insurance issues caused him to experience worsening symptoms. *Id.*  Hospital medical providers instructed Steward to reinitiate Humira upon discharge.  Doc. 8-8, 40.

In reviewing Steward's insurance denial for Humira, it is clear that coverage was not denied for lack of effectiveness.  Rather, it was denied for lack of information.  Steward's insurance company, Aetna, qualified Humira as "a preferred drug on the statewide preferred drug list," but stated in a letter to Steward that "more information is needed."  Specifically, Steward or his physician needed to provide "[c]hart notes showing [Steward] experienced improvement in disease activity and/or level of function since starting Humira."  Doc. 8-7. 643.  As summarized above, these chart notes existed, from both Steward's dermatologist and gastroenterologist.  Still, it appears that Steward failed to respond or to ask his physician to respond.  *Id*.  So, the issue was not Steward's insurance flatly denying Humira's effectiveness—it was Steward's (or his physician's) failure to provide the required documentation.

---

[2] Steward claims in his brief that "[u]nfortunately it does not appear that a referral was made."  Pl. Br. 6.  This is contradicted in the record.

The ALJ was permitted to compare Steward's subjective complaints to his persistence in seeking treatment.  Per Social Security Ruling 16-3p, ALJs can consider:

> [I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record.

As noted by the ALJ, Humira was effective in treating Steward's symptoms, even at its lowest, sub-therapeutic levels.  Steward's gastroenterologist made clear multiple times that, in order to maximize Humira's potential effectiveness, the dose would have to be modified in accordance with Steward's blood and imaging tests.  Doc. 8-7, 69, 77.  His physician even suggested that a second medication could be added in order to bolster Humira's effectiveness. *Id.*  Yet, despite Steward's professed symptoms and the relief offered by Humira, Steward did not attend his follow-up appointments or tests in order to achieve this relief.  Instead, he missed multiple appointments, tests, and procedures.  Doc. 8-7, 69.[3]  Additionally, Steward waited more than *five months* to seek a referral for a new gastroenterologist after his insurance changed and he discontinued Humira.  While the ALJ noted that Steward had issues with his insurance coverage, she also mentioned his previous gaps in, and noncompliance with, treatment.  Tr. 19-20. Steward's history of missing appointments, failing to schedule tests, failing to promptly seek a new gastroenterologist, and failing to seek insurance coverage for a medication that improved his symptoms is inconsistent with his complaints of "severe gastrointestinal issues" and accompanying impairments.  Pl. Br. 7.  For these reasons, Steward's argument regarding the effectiveness of Humira fails.

---

[3] Steward had a history of missing medical appointments.  His record mentions multiple missed appointments with his gastroenterologists, dermatologists, and infusion centers.  Doc. 8-7, 95, 156, 158.

B. *Steward's ability to perform certain activities at home*

Steward claims that the ALJ erroneously considered activities that he was capable of performing at home while determining his RFC, without also considering the fact that he would have easy access to a bathroom at home.  Pl. Br. 9.  However, Steward incorrectly identified the ALJ's reasoning.  The ALJ did not determine Steward's RFC based on the activities he described as performing at home—rather, the ALJ found that the "fairly limited" daily activities Steward described were "difficult to attribute…to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other facts discussed in this decision."  Tr. 10.  In other words, the ALJ calculated Steward's RFC by considering his "*credibly* established limitations" based on the evidence of Steward's medical examinations, as was her purview.  *Rutherford v. Barnhart,* 399 F.3d 546, 551 (3d Cir. 2005) (emphasis added). Since the ALJ based her opinion of Steward's "credibly established limitations" on substantial evidence, this claim also fails.

C. *Steward's RFC did not incorporate his necessary limitations in his medical records*

Steward contends that the ALJ did not incorporate the limitations substantiated by his medical record into his RFC.  Pl. Br. 9.  He alleges that the ALJ "failed to explain why the records of treatment from Eastern Pennsylvania Gastroenterology and Liver Specialists for the period from 2018- 2020 and from Lehigh Valley Hospital for the Plaintiff's hospitalizations in May, 2018, June, 2018, and April, 2021 from his gastroenterological conditions were not considered as part of the Plaintiff's residual functional capacity." *Id.*  These treatment records comprise the majority of Steward's medical records—yet Steward fails to cite what within the records he believes the ALJ failed to consider.  Furthermore, the April 2021 records are after the date that Steward was insured.  In evaluating Steward's records, the ALJ explained that:

While the claimant had significant complications of inflammatory bowel disease in mid-2018, he subsequently improved with treatment and had adequate physical functioning to perform the demands of the RFC, as evidenced by physical examinations and his response to treatment. In light of evidence that his condition responded well to treatment, his complaints regarding unpredictable, frequent and prolonged use of the bathroom are not well supported.

Tr. 18.  Although Steward now disagrees that Humira adequately controlled his symptoms, the

ALJ considered multiple entries in the record Steward cites in forming her opinion:

> As of November 2019, after starting Humira, the claimant had partial disease response (3F/9). It was noted he had overall 50% improvement since starting biologics (3F/15). He reported improved bowel symptoms as he was only going 3-4 times per day as opposed to 12 times per day (Id.). He still had bloating and cramping abdominal pain (Id.). However, he was no longer having fistula problems (Id.). On exam, his abdomen was soft and nontender, and he had normal bowel sounds (3F/16). After November 2019, claimant did not follow-up with his gastroenterologist until September 2020 (3F/9). At that time, he reported having 4-5 loose stools a day, at least one nighttime awakening, and chronic drainage from two mature fistulas (3F/9). It was noted, however, that he did not have much in the way of active colonic disease as of his last endoscopy and that his issues were mostly skin-related (3F/12).

Tr. 19.  The ALJ also pointed out that Steward self-reported that Humira "provided adequate

control of his symptoms."  Tr. 20.  And she noted that while Steward was actively receiving

treatment, no physicians within his record noted that he was disabled or suffered from disabling

symptoms.  *See, e.g.,* Doc. 8-7, 72 (noting that Steward "does not have much in the way of active

colonic disease."); Tr. 19 (noting the same).  Since the ALJ considered the entirety of Steward's

record and treatment in her opinion, Steward's argument fails.

   *D.  Steward's RFC did not incorporate the VE's response to a hypothetical question*

   Steward also asserts that the ALJ disregarded the VE's opinion that an individual with

Steward's subjective symptoms would be unable to work.  Pl. Br. 10.  During Steward's hearing,

the ALJ asked the VE three hypothetical questions.  The first two described an individual

capable of performing sedentary work, which reflected the ALJ's actual assessment of Steward's

impairments.  Tr. 57-58.  The VE responded that jobs existed in significant numbers in the

national economy for such an individual.  *Id.*  The third hypothetical reflected Steward's self-

reported symptoms.  Tr. 59 ("[H]e has to be off task more than 30% of the workday due to chronic and severe Crohn's disease where he has the uncontrolled need to go to the bathroom and the need to shower to clean himself through the day.")  The VE answered that no work would be possible.  *Id.*

While VEs are typically posed one or more hypothetical questions given certain assumptions about the claimant's physical ability, "the vocational expert's testimony… may only be considered for purposes of determining disability *if* the question *accurately* portrays the claimant's individual physical and mental impairments."  *Podedworny v. Harris,* 745 F.2d 210, 218 (3d Cir. 1984) (emphasis added).  As discussed above, the ALJ concluded that, based on Steward's medical records, his actual impairments were less severe than he described.   She described Steward's actual impairments in her first two hypothetical questions to the VE.  The VE responded that, based on these impairments, Steward would be able to work.  Tr. 58. Because the ALJ's assessment of Steward's impairments is supported by substantial evidence, and because her first two questions to the VE accurately portrayed her assessment, the ALJ properly considered the VE's first two responses and disregarded the third.  This argument also fails.

### E.  *Steward's self-reported symptoms*

Steward argues that the ALJ "failed to consider and explain why the records of treatment…for his gastroenterological conditions were not considered as part of [his] residual functional capacity."  Pl. Br. 9.  Specifically, he cites his "need to use the bathroom several times per day without warning for a period of time lasting from twenty (20) to thirty (30) minutes" as impacting his ability to perform any substantial gainful activity.  Pl. Br. 10.

Under SSR 16-3p, the ALJ must follow a two-step process in evaluating the plaintiff's subjective symptoms: (1) determine if there is an underlying medically determinable physical or mental impairment, shown by medically acceptable clinical and laboratory diagnostic techniques, that could reasonably be expected to produce the plaintiff's pain or symptoms; then (2) evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit the plaintiff's functioning.  In evaluating the intensity, persistence, and limiting effects of a claimant's symptoms, the ALJ must consider relevant factors such as objective medical evidence, evidence from medical sources, treatment course and effectiveness, daily activities, and consistency of the plaintiff's statements with the other evidence of record.  *Id.; see also Thomas v. Kijakazi,* 2022 WL 17880922, at *10 (E.D. Pa. Dec. 22, 2022).

Following this two-step process, the ALJ found that while Steward's condition *could* be expected to cause frequent and lengthy bathroom trips, his record did not support these symptoms.  Tr. 17-18.  As discussed above, the ALJ thoroughly reviewed Steward's medical exams, the opinions of his treating physicians, and his self-reported daily activities.  And, as discussed above, she found that the evidence of Steward's improvement while on Humira did not square with the persistence and intensity of his alleged symptoms.  Tr. 19 ("In light of evidence that his condition responded well to treatment, his complaints regarding unpredictable, frequent, and prolonged use of the bathroom are not well-supported.").  Steward fails to cite any evidence denying the improvement of his symptoms while on Humira, other than positing that such improvement is "speculation."  Pl. Br. 8.  Since the ALJ's opinion regarding Steward's subjective symptoms is supported by substantial evidence, and since the role of this court is not to reweigh the evidence, Steward's claim fails.  *Chandler v. Comm'r of Soc. Sec.,* 667 F.3d 356, 359 (3d Cir. 2011).

*V*.     ***Conclusion***

In accordance with the above discussion, I will enter an Order directing that Steward's

Request for Review be denied, and judgment entered in favor of the Commissioner.


BY THE COURT:


*/s/ Scott W. Reid*
_____
SCOTT W. REID
UNITED STATES MAGISTRATE JUDGE

15